UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

AMEY COOPER and GREGORY SMITH,

                              Plaintiffs,

                 -against-

CITY OF NEW ROCHELLE, DETECTIVE MICHAEL
O'ROURKE, individually and in his capacity as a
member of the City of New Rochelle Police Department;
DETECTIVE JOHN PASTORE, individually and in his
capacity as a member of the City of New Rochelle Police
Department; POLICE OFFICERS JOHN DOE
NUMBERS ONE THROUGH FIVE (fictitious names
whose actual names are presently unknown), individually
and in their capacity as members of the City of New
Rochelle Police Department; POLICE OFFICER JANE
DOE (a fictitious name whose actual name is presently
unknown), individually and in her capacity as a member
of the City of New Rochelle Police Department, and
DETECTIVE JOHN DOE, (a fictitious name whose
actual name is presently unknown) individually and in
his capacity as a member of the City of New Rochelle
Police Department,

                            Defendants.
------------------------------------------------------------------x

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO <u>LOCAL CIVIL RULE 56.1</u>**

CV-11-0069 (JFM) (LMS)

       Defendants, by their attorneys, SOKOLOFF STERN LLP, hereby submit the following statement, pursuant to Local Civil Rule 56.1, of which they claim that there are no genuine issues of material fact to be tried:

<u>GREGORY SMITH'S CRIMINAL BACKGROUND</u>

       1.      Plaintiff Gregory Smith ("Smith") has been arrested 23 times. (Ex. G; Ex. L at p. 26.)

       2.      Smith has been charged with seven felonies and 13 misdemeanors. (Ex. G.)

3.      Smith has been convicted ten times, including convictions for one felony and eight misdemeanors.  (Ex. G.)

4.      In February 1987, Smith was arrested for criminal possession of a controlled substance in the seventh degree and pled guilty to disorderly conduct for violent behavior.  (Ex. H.)

5.      In June 1989, Smith was arrested and charged with three counts of criminal sale of a controlled substance in the third degree, three counts of criminal possession of a controlled substance in the third degree, and three counts of criminal possession of a controlled substance in the seventh degree.  (Ex. G; Ex. H; Ex. I.)

6.      Smith pled guilty to criminal sale of a controlled substance in the fourth degree and received one year in prison and five years probation.  (Ex. G; Ex. H; Ex. I; Ex. L at p. 136.)

7.      Smith violated his probation in February 1991 and was sentenced to one year in prison.  (Ex. G.)

8.      Smith testified that he intentionally violated his probation because he preferred to serve the time in jail.  (Ex. L at pp. 45-46.)

9.      In May 1993, Smith was arrested and charged with criminal possession of a controlled substance in the fifth degree for cocaine possession and resisting arrest.  (Ex. G; Ex. H; Ex. I.)

10.     He pled guilty to resisting arrest and received six months in prison.  (Ex. G; Ex. H; Ex. I.)

11.     In November 1993, Smith was arrested and charged with, *inter alia*, criminal possession of a controlled substance in the seventh degree, criminal impersonation in the second degree, and resisting arrest.  (Ex. G; Ex. H; Ex. I.)

12.     He pled guilty to possession of a controlled substance and was sentenced to six months in prison.  (Ex. G; Ex. H; Ex. I.)

13.     In April 1997, Smith was arrested and charged with criminal possession of a controlled substance in the seventh degree and unlawful possession of marijuana.  (Ex. G; Ex. H; Ex. I.)

14.     Smith pled guilty to criminal possession of a controlled substance.  (Ex. G; Ex. H; Ex. I.)

15.     In February 2001, Smith was arrested and charged with unlawful possession of marijuana, among other things.  (Ex. G; Ex. H; Ex. I.)

16.     Smith was found guilty after a jury trial and he was sentenced to six months in jail.  (Ex. G; Ex. H; Ex. I; Ex. L at p. 33.)

17.     In March 2003, Smith pled guilty to criminal possession of marijuana in the fifth degree and criminal possession of a controlled substance in the seventh degree and was sentenced to 90 days in prison.  (Ex. G; Ex. H; Ex. I.)

18.     In February 2005, Smith was arrested and charged with unlawful possession of marijuana and resisting arrest.  (Ex. G; Ex. H.)

19.     He pled guilty to resisting arrest and was sentenced to three months imprisonment.  (Ex. G; Ex. H.)

20.     In August 2008, Smith was sentenced to another five months in prison.  (Ex. G; Ex. H; Ex. I.)

21.     In September 2008, Smith was arrested and charged with unlawful possession of marijuana.  (Ex. J.)

22.     He pled guilty.  (Ex. K.)

23.    Smith served three months in jail in 2009.  (Ex. M at pp. 20, 23.)

24.    Smith smokes marijuana two to three times a week.  (Ex. L at p. 55.)

25.    He testified that he used to use and sell drugs, including cocaine.  (Ex. L at pp. 54, 136, 218.)

26.    Smith knew cocaine dealers in the City of New Rochelle ("the City").  (Ex. L at p. 60.)

## THE DETECTIVES' BACKGROUND

27.    Detective Pastore started his career with the New Rochelle Police Department (NRPD) in 1989.  (Ex. N at p. 6.)

28.    He was promoted to detective in 1996.  (Ex. N at p. 9.)

29.    He worked in the narcotics unit from 1995 to 2006 and from 2008 to 2011.  (Ex. N at pp. 8-9.)

30.    Detective Pastore retired in 2011.  (Ex. N at pp. 5-6.)

31.    Detective O'Rourke has been employed by the NRPD for 19 years since 1993 (Ex. O at pp. 5-7.)

32.    He was promoted to Detective in 2003.  (Ex. O at pp. 9-10.)

33.    He has worked in the special investigations unit conducting narcotics investigations since 2003.  (Ex. O at pp. 9-10, 12-13.)

34.    In November 2008, Detectives O'Rourke and Pastore were partners in the special investigations/narcotics unit.  (Ex. N at pp. 13-14; Ex. O at pp. 32, 34.)

35.    The Detectives were trained in the Police Academy.  (Ex. N at pp. 6-7; Ex. O at p. 8.)

36.     The Detectives received training in the penal law, police tactics, and constitutional law, among various other things.  (Ex. N at p. 7; Ex. O at pp. 8-9.)

37.     The Detectives received regular in-service training throughout their careers.  (Ex. N at p. 10; Ex. O at p. 12; Ex. P; Ex. Q.)

38.     They received yearly training on NRPD rules and regulations and the laws.  (Ex. N at p. 10.)

39.     The Detectives participated in "numerous classes" on penal law, criminal procedure law, and vehicle and traffic law.  (Ex. N at p. 7.)

40.     They received training on probable cause, stopping vehicles, and arrest procedure. (Ex. N at pp. 7-8; Ex. O at pp. 23-27.)

41.     The Detectives were trained on search and seizure procedures specific to drug investigations.  (Ex. N at pp. 11-12; Ex. O at p. 17; Ex. P; Ex. Q.)

42.     Detective O'Rourke received training in dealing with confidential informants. (Ex. O at pp. 14, 21-22.)

43.     Detective O'Rourke has made hundreds of arrests throughout his career.  (Ex. O at p. 151.)

44.     Both Detectives have received commendations and awards throughout their careers.  (Ex. P; Ex. Q.)

**THE USE OF CONFIDENTIAL INFORMANTS BY THE NRPD**

45.     The NRPD utilizes paid informants during drug investigations.  (Ex. O at p. 15.)

46.     A prospective confidential informant must fill out a form.  (Ex. O at pp. 15, 21.)

47.     The applicant is then interviewed.  (Ex. O at p. 15.)

48.    Confidential informants must prove themselves trustworthy by providing reliable information to the detectives.  (Ex. O at p. 15.)

49.    It is up to the individual detective to determine how to handle an informant.  (Ex. O at pp. 21-22.)

50.    The detective and the unit supervisor determine whether and how much an informant will be paid.  (Ex. O at pp. 22-23.)

51.    The amount of money an informant is paid is based on the quality of information provided.  (Ex. O at pp. 23, 57.)

52.    The detective and unit supervisor determine the quality of information.  (Ex. O at pp. 42, 57.)

53.    Detective O'Rourke had experience with using confidential informants.  (Ex. O at pp. 13, 15.)

## NOVEMBER 1, 2008

54.    On November 1, 2008, Smith walked from his ex-girlfriend's apartment in Mount Vernon to a McDonald's in the Bronx for breakfast.  (Ex. L at pp. 62-65.)

55.    After he stopped at McDonald's, Smith saw "Rude Boy."  (Ex. L at p. 69.)

56.    "Rude Boy" was a drug dealer.  (Ex. L at pp. 51-52.)

57.    Smith and "Rude Boy" were "acquaintance[s]."  (Ex. L at pp. 47-49.)

58.    Smith purchased two bags of marijuana from "Rude Boy."  (Ex. L at pp. 33, 47-49, 51.)

59.    Smith then went to his late father's apartment building in New Rochelle to clean it out.  (Ex. L at pp. 64-65, 68-69; Ex. R at p. 10.)

60.    Smith was at his father's apartment for a few hours.  (Ex. L at p. 77.)

61.    Smith left the apartment building at approximately 8:30 p.m.  (Ex. L at p. 78.)

**THE STOP**

62.    Plaintiff Amey Cooper's ("Cooper") mother lived in the same apartment building as Smith's father.  (Ex. L at p. 82; Ex. M at p. 10; Ex. R at p. 12; Ex. S at p. 11.)

63.    Cooper was also at the apartment building visiting her mother on November 1, 2008.  (Ex. S at p. 9.)

64.    Smith saw Cooper as he was leaving and asked her for a ride to the deli and then to Mount Vernon.  (Ex. L at pp. 78, 82, 106-08; Ex. M at pp. 24-25, 27-28, 37; Ex. R at pp. 10, 13; Ex. S at pp. 10-12.)

65.    Cooper agreed to give Smith a ride.  (Ex. R at p. 13; Ex. S at pp. 12, 13.)

66.    Cooper drove a tan Jeep Grand Cherokee.  (Ex. L at p. 107; Ex. M at p. 26; Ex. O at p. 77; Ex. S at p. 9.)

67.    Smith put some kitchen utensils and a brand new Dewalt power saw in Cooper's trunk.  (Ex. L at pp. 81, 84-85, 107; Ex. M at p. 34; Ex. R at pp. 10-11, 14.)

68.    Smith got into the front passenger seat of Cooper's vehicle at approximately 9:00 p.m.  (Ex. L at pp. 105, 107; Ex. S at p. 13.)

69.    Cooper stopped at the deli on Horton Avenue and Brook Street.  (Ex. L at p. 81; Ex. M at p. 28; Ex. R at p. 14; Ex. S at p. 13.)

70.    She parked her vehicle across the street from the deli.  (Ex. L at p. 120; Ex. M at p. 37.)

71.    Cooper waited in the car while Smith went into the store.  (Ex. L at p. 120; Ex. S at p. 13.)

72.    Smith went into the deli and bought two cigars.  (Ex. L at pp. 124-25; Ex. R at pp. 14-15.)

73.    Smith also walked over to a bar on the same block.  (Ex. L at pp. 109, 124; Ex. R at p. 15.)

74.    Smith saw people that he knew outside the bar.  (Ex. L at p. 131.)

75.    Smith spoke with people whom he knew to be drug dealers.  (Ex. L at p. 132.)

76.    Smith "spoke with an individual and waived hello . . . ."  (Ex. R at p. 15.)

77.    Smith saw "Moore" outside the bar, said "What's up?" and waived to him.  (Ex. L at pp. 132-33, 137; Ex. R at p. 97.)

78.    Smith knew that "Moore" was a drug dealer.  (Ex. L at pp. 133, 137; Ex. R at p. 98.)

79.    Smith got back in Cooper's car at approximately 9:10 p.m.  (Ex. L at pp. 109, 130; Ex. M at p. 38; Ex. R at pp. 15-16; Ex. S at p. 13.)

80.    Smith had two cigars and two plastic bags of marijuana in his shirt pocket.  (Ex. L at pp. 33, 139-40; Ex. R at p. 27.)

81.    Cooper and Smith headed to Mount Vernon.  (Ex. L at p. 81; Ex. R at p. 17.)

82.    Cooper made a left onto Brook Street from Horton Avenue and then a right onto Lincoln Avenue.  (Ex. L at pp. 145-46; Ex. M at p. 42; Ex. R at p. 17; Ex. S at p. 13.)

83.    Cooper drove six or seven blocks on Lincoln Avenue before noticing flashing police lights behind her.  (Ex. M at p. 42; Ex. R at pp. 17-18; Ex. S at p. 13.)

84.    Cooper pulled over to the right side of the road between Oakdale Avenue and Storer Avenue.  (Ex. L at p. 146; Ex. M at p. 42; Ex. N at p. 27; Ex. O at pp. 78-79; Ex. R at p. 18; Ex. S at pp. 14-15.)

85.    An unmarked police car pulled up behind Cooper's vehicle.  (Ex. M at p. 42; Ex. S at p. 14.)

## THE CONFIDENTIAL INFORMANT'S TIP

86.    On November 1, 2008, Detectives O'Rourke and Pastore were conducting surveillance in the area of Horton Avenue and Brook Street in New Rochelle.  (Ex. O at p. 38; Ex. T.)

87.    The area was a known drug area.  (Ex. N at p. 16; Ex. O at p. 38.)

88.    While in the area of Horton Avenue and Brook Street, Detective O'Rourke received a phone call on his cell phone from a past proven reliable confidential informant.  (Ex. N at pp. 17-18, 22; Ex. O at pp. 45, 52-53, 55, 67; Ex. T; Ex. U.)

89.    The confidential informant was registered to Detective O'Rourke.  (Ex. N at p. 20; Ex. O at pp. 54-55.)

90.    Detective Pastore knew the confidential informant.  (Ex. N at p. 20.)

91.    Detective O'Rourke had received information from this particular informant in the past.  (Ex. O at pp. 55-56.)

92.    Detective O'Rourke had used this informant more than ten times in the past and had personally paid him each time with NRPD money.  (Ex. O at p. 56-57.)

93.    The confidential informant called Detective O'Rourke whenever he had information.  (Ex. O at p. 58.)

94.    Detective Pastore was present when Detective O'Rourke received the call from the informant.  (Ex. N at p. 18; Ex. O at p. 63.)

95.    Detective Pastore did not speak to the informant.  (Ex. N at pp. 19-20.)

96.     The informant stated that a male by the name of Gregory Smith purchased and was in possession of crack cocaine at Horton Avenue.  (Ex. N at p. 22; Ex. O at pp. 45, 59; Ex. T; Ex. U.)

97.     The informant stated that Smith was entering a Jeep.  (Ex. T.)

98.     The informant described Smith and the Jeep.  (Ex. U.)

99.     The conversation with the informant lasted a couple of minutes.  (Ex. O at p. 66.)

100.    The Detectives knew that Smith was the person identified by the informant.  (Ex. N at pp. 38-39.)

101.    The Detectives knew Smith's name and face prior to November 1, 2008 as they had seen him "numerous, numerous times" in known drug locations during their careers.  (Ex. N at pp. 37-38; Ex. O at pp. 59-60, 62; Ex. T.)

102.    The Detectives observed Smith walking on Horton Avenue and entering the front passenger seat of a Jeep Grand Cherokee at the corner of Horton Avenue and Brook Street.  (Ex. N at pp. 23-24; Ex. O at pp. 66-67, 70-73, 92; Ex. T.)

103.    The Detectives followed the vehicle from Brook Street to Lincoln Avenue.  (Ex. N at pp. 24-25; Ex. O at p. 74; Ex. T.)

104.    Detective O'Rourke drove.  (Ex. N at p. 23; Ex. O at p. 67.)

105.    The Detectives never lost sight of the vehicle.  (Ex. N at pp. 24-25.)

106.    Detective O'Rourke followed the vehicle for a few minutes and pulled it over at Lincoln Avenue and Oakdale Avenue minutes after Smith had entered.  (Ex. N at pp. 24-27; Ex. O at pp. 73-74, 79; Ex. T.)

107.    Detective O'Rourke stopped the vehicle because the informant advised him that Smith was in possession of narcotics.  (Ex. O at pp. 44-45, 75-76, 91-92.)

108.    It was Detective O'Rourke's decision to stop the vehicle.  (Ex. N at p. 25.)

109.    Detective O'Rourke subsequently paid the confidential informant for the information he provided on November 1, 2008.  (Ex. V.)

**SMITH'S ARREST**

110.    The Detectives approached the vehicle.  (Ex. N at p. 27; Ex. O at pp. 80-81; Ex. T.)

111.    The Detectives were wearing their shields around their necks and identified themselves as police officers.  (Ex. N at p. 28; Ex. O at p. 82.)

112.    Smith recognized the Detectives.  (Ex. L at pp. 147, 149; Ex. R at pp. 19-20.)

113.    Detective Pastore advised Cooper that there was reason to believe that Smith had committed a crime.  (Ex. N at pp. 30-31.)

114.    Cooper was advised that she did not do anything wrong.  (Ex. M at p. 43; Ex. S at pp. 14, 46.)

115.    Detective O'Rourke asked Smith his name and Smith answered.  (Ex. M at p. 43; Ex. R at p. 20; Ex. S at p. 14.)

116.    Detective O'Rourke asked Smith to exit the vehicle.  (Ex. M at p. 43; Ex. O at pp. 82, 84-85; Ex. R at p. 20; Ex. S at p. 14; Ex. T.)

117.    Smith exited the vehicle.  (Ex. M at p. 43; Ex. N at p. 30; Ex. O at pp. 84-85; Ex. R at p. 20; Ex. S at p. 15.)

118.    Detective O'Rourke informed Smith that he was conducting a drug investigation.  (Ex. O at p. 85; Ex. T; Ex. U.)

119.    Detective O'Rourke asked Smith if he was in possession of any drugs.  (Ex. O at p. 85; Ex. T.)

120.    Smith replied, "I have some weed in my pocket."  (Ex. O at p. 85; Ex. T; Ex. W.)

121.    Smith removed two plastic bags containing marijuana from his shirt pocket and handed them to Detective O'Rourke.  (Ex. C; Ex. E; Ex. F; Ex. L at p. 153; Ex. O at p. 86; Ex. T; Ex. U.)

122.    Detective O'Rourke then handcuffed Smith behind his back and advised him that he was under arrest.  (Ex. N at pp. 44, 47; Ex. O at pp. 85-86, 92-93; Ex. T; Ex. U.)

123.    Detective O'Rourke then conducted a search of Smith incident to arrest.  (Ex. A ¶ 24; Ex. E; Ex. F; Ex. O at p. 94; Ex. R at p. 25; Ex. T; Ex. U.)

124.    Detective O'Rourke asked Cooper if he could search the seat where Smith was sitting.  (Ex. A ¶¶ 22; Ex. M at p. 54; Ex. O at p. 129; Ex. S at pp. 14, 17-18.)

125.    Cooper allowed him to conduct the search.  (Ex. M at p. 54; Ex. N at p. 56; Ex. O at p. 129; Ex. S at pp. 18, 19; Ex. T.)

126.    Detective O'Rourke searched the areas around Smith's seat.  (Ex. A ¶ 22; Ex. M at p. 55; Ex. S at p. 19.)

127.    Detective O'Rourke asked Smith who he had been talking to.  (Ex. A ¶ 24; Ex. L at p. 153; Ex. R at pp. 28-29.)

128.    Smith knew that Detective O'Rourke was referring to "Moore."  (Ex. L at p. 154; Ex. R at p. 97.)

129.    Detective O'Rourke testified that he observed Smith trying to open or unravel two small plastic bags of crack cocaine behind his back.  (Ex. O at pp. 100-03; Ex. T; Ex. U.)

130.    Detective O'Rourke attempted to recover the cocaine from Smith.  (Ex. O at p. 103; Ex. T.)

131.    Detective O'Rourke and Smith struggled.  (Ex. O at p. 106; Ex. U.)

132.    Detective Pastore was not involved in the struggle with Smith.  (Ex. N at p. 46.)

133.    He did not witness the struggle between Smith and Detective O'Rourke.  (Ex. N at p. 46.)

134.    Detective Pastore was talking to Cooooper during the struggle between Smith and Detective O'Rourke.  (Ex. N at pp. 32-33.)

135.    Detective O'Rourke testified that Smith resisted and kicked him in the stomach. (Ex. O at pp. 94-99, 106-08, 114; Ex. T; Ex. U.)

136.    Smith claims that Detective O'Rourke punched him in the mouth and choked him. (Ex. A ¶ 24; Ex. L at pp. 153, 158.)

137.    Detective Pastore did not punch or choke Smith.  (Ex. E; Ex. F; Ex. R at p. 88.)

138.    Detective O'Rourke denies choking Smith or striking him in any way.  (Ex. O at pp. 109, 113-14.)

139.    Cooper did not observe Detective O'Rourke punch Smith.  (Ex. E; Ex. F; Ex. LL.)

140.    Detective Pastore did not observe Detective O'Rourke punch or choke Smith. (Ex. N at pp. 65-66.)

141.    There were no witnesses to the alleged punch.  (Ex. L at pp. 164-66; Ex. N at pp. 65; Ex. R at pp. 32-33; Ex. S at p. 22.)

142.    Detective O'Rourke and Smith ended up on the ground.  (Ex. L at pp. 161-62; Ex. N at p. 33; Ex. O at pp. 106-10.)

143.    Detective Pastore saw Smith and Detective O'Rourke go to the ground and went over to them.  (Ex. N at pp. 33-34, 40.)

144.    Detectives Pastore and O'Rourke lifted Smith off the ground.  (Ex. L at p. 158; Ex. N at pp. 40, 44-45.)

145.    Smith testified that Detective Pastore stopped Detective O'Rourke from choking him.  (Ex. L at p. 164; Ex. R at p. 90.)

146.    Detective O'Rourke recovered two small bags of crack cocaine from the ground near Smith.  (Ex. O at pp. 103-05, 115, 125; Ex. T; Ex. U; Ex. X; Ex. Y; Ex. Z.)

147.    Detective Pastore observed the recovered cocaine and marijuana at the scene. (Ex. N at pp. 50-52.)

148.    Backup arrived and Smith was removed from the scene and transported to police headquarters by NRPD patrol officers.  (Ex. A ¶ 26; Ex. L at p. 163; Ex. M at p. 63; Ex. N at pp. 45, 53-54; Ex. O at pp. 118, 120-21, 124-25; Ex. R at pp. 33, 35-36; Ex. T.)

149.    Detective Pastore did not use excessive force against Cooper or Smith.  (Ex. E; Ex. F.)

150.    Smith testified that Detective Pastore did not do anything wrong.  (Ex. R at p. 103.)

151.    Smith testified that no other NRPD officers besides Detective O'Rourke mistreated him.  (Ex. R at pp. 102-03.)

152.    Smith testified that his claims are only against Detective O'Rourke.  (Ex. R at p. 103.)

**THE SEARCH OF COOPER'S VEHICLE**

153.    A uniformed female officer then arrived and searched Cooper's person, wallet, and pocketbook.  (Ex. A ¶ 30; Ex. M at p. 62; Ex. S at pp. 26-27, 38.)

154.    The Detectives did not search Cooper's person.  (Ex. M at p. 62; Ex. N at pp. 54-55; Ex. O at p. 143.)

155.    No contraband was recovered from Cooper's person.  (Ex. A ¶ 30; Ex. M at pp. 62-63; Ex. N at p. 55.)

156.    Detective O'Rourke searched Cooper's entire vehicle except for the engine.  (Ex. M at pp. 63-65; Ex. N at p. 55; Ex. O at pp. 127-28, 131.)

157.    Cooper did not object to the search of her vehicle.  (Ex. O at pp. 129-30.)

158.    No contraband was found in Cooper's vehicle.  (Ex. A ¶ 33; Ex. N at p. 58; Ex. O at pp. 132, 143; Ex. T.)

159.    Detective Pastore did not participate in the search of Cooper's vehicle.  (Ex. M at pp. 63-65; Ex. N at p. 59.)

160.    Smith was not present when the vehicle was searched.  (Ex. S at p. 34.)

161.    There were no witnesses to the search.  (Ex. S at pp. 36-37.)

162.    Detective O'Rourke found a brand new Dewalt power saw in Cooper's trunk. (Ex. A ¶ 32; Ex. T.)

163.    Detective O'Rourke asked Cooper who the saw belonged to.  (Ex. M at p. 65; Ex. N at p. 60.)

164.    Cooper stated that she was unsure who the saw belonged to.  (Ex. M at p. 65; Ex. N at p. 60; Ex. O at p. 135; Ex. T.)

165.    The officers took the saw and logged it for safekeeping in order to determine who the owner was.  (Ex. A ¶ 39; Ex. N at pp. 60-61; Ex. O at pp. 135-36; Ex. T; Ex. X; Ex. Y.)

166.    Only the saw was seized.  (Ex. M at p. 65; Ex. N at pp. 61-62; Ex. O at p. 142; Ex. S at p. 34.)

167.    Detectives Pastore and O'Rourke returned to headquarters.  (Ex. N at pp. 64-65; Ex. O at p. 150.)

168.    Cooper did not do anything illegal and was not in custody or under arrest.  (Ex. A ¶ 38; Ex. N at p. 58; Ex. O at pp. 146, 149.)

169.    Cooper was not issued any citations.  (Ex. A ¶ 38; Ex. O at pp. 75, 149.)

170.    Cooper was not struck by any of the officers.  (Ex. E; Ex. F; Ex. S at pp. 38-39.)

**SMITH'S MEDICAL TREATMENT**

171.    Smith did not complain of any injuries to the Detectives at the scene.  (Ex. L at p. 166; Ex. N at p. 52; Ex. O at p. 117.)

172.    The Detectives did not observe Smith to be injured at the scene.  (Ex. N at p. 52; Ex. O at p. 117.)

173.    While being transported to the police department, Smith complained to the patrol officer that his mouth was bleeding and several of his bottom teeth were loose.  (Ex. L at pp. 166-67.)

174.    When he arrived at the police station, Smith complained of pain to his mouth and jaw and requested medical attention.  (Ex. L at p. 191; Ex. LL.)

175.    Smith testified that he was not in "severe pain."  (Ex. R at p. 64.)

176.    An officer told Smith he would send for an ambulance.  (Ex. R at p. 37.)

177.    Sergeant Fagan examined Smith's mouth and called an ambulance.  (Ex. L at pp. 166, 191; Ex. R at p. 38; Ex. LL.)

178.    Sergeant Fagan did not observe any injuries.  (Ex. LL.)

179.    An ambulance arrived and transported Smith to the hospital about an hour to an hour and a half after he arrived at the police station.  (Ex. L at p. 195; Ex. R at p. 40.)

180.    Smith was transported to Sound Shore Medical Center emergency room for treatment.  (Ex. A ¶ 42; Ex. O at p. 171; Ex. R at pp. 41-42; Ex. AA; Ex. LL; Ex. MM.)

181.    The doctor who examined Smith did not observe any injuries.  (Ex. AA; Ex. LL; Ex. NN.)

182.    Smith was advised that his teeth were loose and would tighten up.  (Ex. R at pp. 44, 46.)

183.    The bleeding stopped on its own after a couple of hours.  (Ex. L at pp. 199-200.)

184.    Smith did not lose any teeth.  (Ex. L at p. 159; Ex. R at pp. 44, 64.)

185.    Smith is no longer in pain.  (Ex. L at p. 205; Ex. R at p. 65.)

186.    Smith was released and brought back to the police station for processing.  (Ex. A ¶ 42; Ex. L at pp. 199-200; Ex. R at p. 48; Ex. AA.)

187.    Three or four days later, Smith went to a dentist who recommended that he see an oral surgeon.  (Ex. L at pp. 180, 185, 187.)

188.    However, Smith did not seek any other medical attention.  (Ex. L at pp. 180, 187; Ex. R at p. 54.)

189.    His teeth "tightened back up" and are now normal.  (Ex. L at pp. 179, 187; Ex. R at p. 63.)

## SMITH'S PROCESSING

190.    Smith was read his Miranda rights.  (Ex. O at p. 93; Ex. BB.)

191.    Sergeant Fagan booked Smith for tampering with physical evidence, criminal possession of a controlled substance in the seventh degree, unlawful possession of marijuana, and harassment.  (Ex. O at p. 156; Ex. T.)

192.    Smith was informed of the charges against him, told when to be in court, and issued an appearance ticket.  (Ex. A ¶ 42; Ex. L at p. 191; Ex. R at pp. 50-51; Ex. T; Ex. CC.)

193.    Plaintiff was bailed out for $750 and released.  (Ex. A ¶ 42; Ex. L at pp. 190, 200; Ex. R at pp. 48, 51-52; Ex. T; Ex. DD.)

194.    The crack cocaine and marijuana were entered into evidence.  (Ex. N at pp. 66-67; Ex. O at p. 126; Ex. T; Ex. X; Ex. Y; Ex. Z.)

195.    The saw was vouchered into property.  (Ex. O at p. 137; Ex. X; Ex. Y.)

196.    Tests confirmed that the two bags of white powder Detective O'Rourke recovered from Smith contained crack cocaine.  (Ex. T; Ex. EE.)

## SMITH'S PROSECUTION

197.    Detective O'Rourke went to the prosecutor's office to file charges.  (Ex. N at p. 70.)

198.    Detective O'Rourke provided information to the prosecutor.  (Ex. O at pp. 159-60, 163.)

199.    Detective Pastore did not provide any information to the prosecutor.  (Ex. N at p. 69-70.)

200.    Detective Pastore never spoke to the prosecutor or went to the prosecutor's office with regard to Smith's prosecution for the incident.  (Ex. N at p. 69.)

201.    The prosecutor decides whether to file charges based on the police report and officer interviews.  (Ex. O at p. 158.)

202.    Smith was charged via misdemeanor information with obstructing governmental administration in the second degree, criminal possession of a controlled substance in the seventh degree, resisting arrest, and unlawful possession of marijuana.  (Ex. A ¶ 44; Ex. N at p. 69-70; Ex. FF.)

203.    Detective O'Rourke signed the information as the complaining witness.  (Ex. N at pp. 69-70; Ex. O at p. 160, 163, 156-57; Ex. FF.)

204.    Detective Pastore did not participate in drafting the complaint.  (Ex. N at p. 69.)

205.    Smith pled not guilty and requested Mapp, Dunaway, and Huntley hearings.  (Ex. R at p. 81.)

206.    The prosecutor decided not to pursue the charges against Smith based on concerns about producing and potentially damaging the confidential informant.  (Ex. K.)

207.    On March 11, 2009, the charges against Smith were dismissed.  (Ex. A ¶ 45; Ex. K.)

**LIEUTENANT ROBINSON'S BACKGROUND**

208.    Lieutenant Robinson has been an officer with the NRPD since 1995.  (Ex. GG at p. 7.)

209.    He has been Detective Lieutenant for the NRPD Internal Affairs unit since 2008.  (Ex. GG at pp. 8.)

210.    Lieutenant Robinson was trained by the previous Internal Affairs lieutenant.  (Ex. GG at pp. 8-9.)

211.    He was trained in arrest procedures, probable cause, identifying crimes, and traffic infractions.  (Ex. GG at pp. 9-10.)

212.    He has made over 100 arrests and has participated in several hundred investigations.  (Ex. GG at pp. 10-11.)

213.    All civilian complaints made to the NRPD are investigated.  (Ex. GG at p. 11.)

214.    Lieutenant Robinson interviews the complainant, the officers involved, and any witnesses.  (Ex. GG at p. 16.)

215.    He gathers as much information as possible and makes a determination.  (Ex. GG at p. 17.)

216.    He informs the officers and the civilians of the outcomes of his investigations. (Ex. GG at p. 20.)

217.    He advises the complainant if disciplinary action is taken.  (Ex. GG at pp. 20-21.)

218.    The NRPD uses progressive discipline of its officers based on disciplinary history.  (Ex. GG at pp. 19-20.)

219.    Discipline ranges from positive discipline such as a verbal reprimand or re-training to negative discipline such as a written reprimand or termination.  (Ex. GG at p. 19.)

220.    The NRPD keeps records of positive discipline.  (Ex. GG at p. 57.)

221.    Negative discipline is imposed upon officers who repeat the same behavior.  (Ex. GG at p. 58.)

## COOPER'S CIVILIAN COMPLAINT

222.    On November 1, 2008, Cooper complained to Sergeant Fagan about the incident. (Ex. M at pp. 68, 72; Ex. S at pp. 37, 46.)

223.    Sergeant Fagan investigated her complaint.  (Ex. LL.)

224.    Cooper returned to the NRPD a couple of days later and spoke with Lieutenant Robinson.  (Ex. M at p. 69; Ex. GG at p. 21.)

225.    Cooper complained about the stop and search of her vehicle.  (Ex. GG at p. 37.)

226.    She also complained that Detective O'Rourke was rude to her.  (Ex. GG at p. 40.)

227.    Robinson investigated Cooper's complaint.  (Ex. HH.)

228.    Lieutenant Robinson interviewed Cooper and looked at photographs she had taken.  (Ex. GG at pp. 38, 40-41, 43.)

229.   There were no independent witnesses to her complaint.  (Ex. GG at p. 40.)

230.   Lieutenant Robinson questioned Detective Pastore about Cooper's complaint. (Ex. N at pp. 71-72.)

231.   Lieutenant Robinson questioned Detective O'Rourke about her complaint.  (Ex. GG at pp. 40-41, 43; Ex. O at pp. 141, 168.)

232.   Sergeant Fagan also interviewed Detective O'Rourke about the complaints.  (Ex. O at p. 168.)

233.   Detective O'Rourke admitted that he removed some items from the glove compartment and did not put them back.  (Ex. GG at p. 44; Ex. HH.)

234.   Lieutenant O'Rourke believed the items should have been returned.  (Ex. GG. At p. 46.)

235.   Lieutenant Robinson partially substantiated Cooper's complaint that Detective O'Rourke did not return items to her glove compartment.  (Ex. GG at pp. 45-46; Ex. HH; Ex. II.)

236.   The lack of witnesses to the event contributed to Lieutenant Robinson's determination.  (Ex. GG at pp. 61-62.)

237.   Lieutenant Robinson sent Cooper a letter advising her that her complaint was partially substantiated.  (Ex. M at p. 71; Ex. GG at p. 59; Ex.II.)

238.   Positive disciplinary action was taken.  (Ex. GG at p. 55; Ex. HH; Ex. II.)

239.   Sergeant Olszewski verbally reprimanded the Detectives.  (Ex. GG at pp. 54-55; Ex. HH.)

240.   Lieutenant Robinson also reprimanded Detective O'Rourke.  (Ex. GG at pp. 55-56; Ex. HH.)

241.   The complaint and disciplinary action taken were logged.  (Ex. GG at p. 57.)

**SMITH'S CIVILIAN COMPLAINT**

242.    Smith filed a civilian complaint alleging that Detective O'Rourke punched him in the face.  (Ex. L at pp. 205-06; Ex. GG at pp. 21, 28.)

243.    Sergeant Fagan investigated the complaint.  (Ex. LL.)

244.    He interviewed Cooper, Smith and Detective O'Rourke.  (Ex. LL.)

245.    Detective O'Rourke denied punching Smith.  (Ex. LL.)

246.    Cooper did not witness Smith being punched.  (Ex. E; Ex. F; Ex. LL.)

247.    Sergeant Fagan was unable to substantiate that Smith was punched.  (Ex. LL.)

248.    Smith spoke with Lieutenant Robinson twice and provided a written statement. (Ex. L at p. 205; Ex. R at p. 99.)

249.    Lieutenant Robinson investigated Smith's complaint.  (Ex. GG at pp. 25, 28-29; Ex. JJ; Ex. KK.)

250.    Lieutenant Robinson interviewed Cooper, Smith, both Detectives, and reviewed the police reports.  (Ex. N at pp. 71-72; Ex. O at pp. 167-68; Ex. GG at pp. 25, 28-29.)

251.    There were no independent witnesses to the incident.  (Ex. GG at pp. 40, 61; Ex. LL.)

252.    Lieutenant Robinson also reviewed Smith's x-rays and paperwork and the confidential informant information.  (Ex. GG at p. 29.)

253.    He reviewed Sergeant Fagan's report regarding Smith's complaint.  (Ex. GG at pp. 59-60; Ex. LL.)

254.    Lieutenant Robinson was unable to substantiate Smith's complaint.  (Ex. L at p. 206; Ex. GG at pp. 31-32; Ex. JJ; Ex. KK.)

255.    The absence of witnesses contributed to this determination.  (Ex. GG at p. 61.)

256.    Lieutenant Robinson documented Smith's complaint.  (Ex. GG at p. 35.)

257.    Lieutenant Robinson sent Smith a letter informing him of the disposition of his complaint.  (Ex. GG at p. 35; Ex. KK.)

258.    Lieutenant Robinson is not aware of any other complaints against Detective O'Rourke.  (Ex. GG at p. 58.)

259.    Smith also complained that the officers confiscated his power saw.  (Ex. GG at p. 49.)

260.    Lieutenant Robinson investigated that complaint.  (Ex. GG at p. 49.)

261.    He questioned Detective O'Rourke about the saw and asked if it was evidence. (Ex. GG at p. 49.)

262.    Lieutenant Robinson was advised that the saw was not evidence or stolen property and was not part of the case.  (Ex. GG at p. 49.)

263.    Lieutenant Robinson returned the saw to Smith.  (Ex. E; Ex. F; Ex. M at pp. 99-100, 208; Ex. R at pp. 95-96; Ex. GG at p. 49.)

264.    Lieutenant Robinson did not think that it was inappropriate to confiscate the saw as potential stolen property because Cooper could not verify who it belonged to.  (Ex. GG at p. 53.)

Dated: Westbury, New York
       May 17, 2012

                                                SOKOLOFF STERN LLP
                                                Attorneys for Defendants

                                    By:        _____
                                                BRIAN S. SOKOLOFF
                                                MARK A. RADI
                                                355 Post Avenue, Suite 201
                                                Westbury, New York 11590
                                                (516) 334-4500
                                                Our File No.: 110003

TO:   REISMAN, RUBEO & McCLURE, LLP
       Attorneys for Plaintiffs
       151 Broadway
       Hawthorne, New York 10532
       (914) 495-3050